F. S. WHELAN & SONS *v.* UNITED STATES

No. 7864.

Entry No. 1496.

(Decided August 16, 1950)

*Kirkland, Fleming, Green, Martin & Ellis* (*Hammond E. Chaffetz, Chauncey P. Carter, Jr.,* and *Elliott L. Thurston, Jr.,* of counsel) for the plaintiff.
*David N. Edelstein,* Assistant Attorney General (*Daniel I. Auster,* special attorney), for the defendant.

MOLLISON, Judge: This is an appeal for reappraisement of birch plywood of certain thicknesses and qualities imported into the United States from Canada and entered on August 25, 1947. The imported merchandise was in carload quantities and was entered at prices per thousand square feet which represented the prices at which the manufacturer thereof offered and sold such merchandise in carload quantities

in the principal market of Canada. It was appraised at higher prices per thousand square feet which represented the prices at which the manufacturer offered and sold such merchandise in quantities of less than 5,000 square feet in the principal market of Canada.

At the trial of the issue counsel agreed as follows:

It is agreed that the principal market in Canada for this merchandise at the time of exportation involved was Montreal, Canada. And it is agreed that if the Court should find the usual wholesale quantity is in quantities of less than carload lots under 5,000 square feet, then the appraised valuation should be affirmed as representative of the foreign value under the provisions of Sec. 402-c of the Tariff Act of 1930 and that there were no higher export values and if the Court should find that carload lots are the usual wholesale quantity then the entered value represents the foreign value and that there was no higher export value for the merchandise. (R. pp. 10–11.)

It therefore appears that there is no question but that the proper basis of value for the merchandise is foreign value, as defined in section 402 (c) of the Tariff Act of 1930, as amended by section 8 of the Customs Administrative Act of 1938 (19 U. S. C. § 1402, as amended), which, for convenience, is set forth in the margin.[1]

There is no dispute as to the facts. It appears from the record that at the time of exportation of the involved shipment the manufacturer and exporter freely offered and sold merchandise such as that here involved to all purchasers in Canada for home consumption at three different prices, based upon the quantity purchased in any given transaction. Thus, the lowest price per unit was offered to purchasers who purchased in carload quantities, a higher price to purchasers who purchased in less than carload quantities but over 5,000 square feet, and the highest price to purchasers who purchased in quantities under 5,000 square feet. The differential between the lowest and highest price was approximately 20 per centum.

The instant case is in the nature of a test case, having arisen upon one of a number of shipments made during the period from August 15, 1947, through May 2, 1948. By agreement of counsel (R. p. 5) the sales experience of the manufacturer and exporter during the period from October to December 1947 was selected as typical and representative of the situation as to sales of such merchandise in the principal market of Canada at the time the particular merchandise here involved was exported from Canada.

As shown in exhibit 2, a photostat of a summary and recapitulation of all sales made by the manufacturer and exporter in the selected

---

[1] SEC. 402. VALUE.

* * * * * * *

(c) FOREIGN VALUE.—The foreign value of imported merchandise shall be the market value or the price at the time of exportation of such merchandise to the United States, at which such or similar merchandise is freely offered for sale for home consumption to all purchasers in the principal markets of the country from which exported in the usual wholesale quantities and in the ordinary course of trade, including the cost of all containers and coverings of whatever nature, and all other costs, charges, and expenses incident to placing the merchandise in condition, packed ready for shipment to the United States.

period, there were 268 sales of merchandise such as is here involved in the Canadian market. Of these, 59 were in carload quantities, 39 were in quantities less than a carload but over 5,000 square feet, while 170 were in less than carload quantities and under 5,000 square feet. The carload quantity sales represented 90.59 per centum of the total volume in square feet of the sales in the Canadian market and 89.15 per centum of the total invoice value of such sales. The percentages under the same headings of the less than carload but over 5,000 square feet sales were 4.57 per centum and 5 per centum, respectively, and of the less than carload and under 5,000 square feet sales were 4.84 per centum and 5.85 per centum, respectively. For ready reference, these figures are shown in tabulation form in the margin.[2]

The issue as presented by counsel for both parties involves the interpretation of the expression "the usual wholesale quantities" found in section 402 (c), *supra*. On the part of the plaintiff, it is contended that in the determination of "the usual wholesale quantities" for the purpose of establishing statutory foreign value all of the relevant factors with respect to the offer and sale of merchandise such as that under consideration in the foreign market must be taken into consideration, e. g., the nature of the commodity, the normal method of its distribution, the volume and value of business done therein, plant facilities, trade practice, etc. Thus, it is pointed out that the evidence shows that plywood is a bulk commodity which at the manufacturer's level is normally sold at wholesale to local distributors in carload quantities for the reason that such practice results in the lowest distribution costs per unit; that approximately 90 per centum of the sales on both the volume and money basis during the selected period was on a carload basis; and that sales in less than carload quantities were in the nature of accommodation sales made to service customers who were not located in areas serviced by local distributors or who wished sizes or qualities not stocked by local distributors.

On the other hand, the defendant contends that under the so-called "major portion of sales" doctrine all of the sales or offers for sale in wholesale quantities which are in accordance with the statutory requirements (i. e., freely offered to all purchasers in the ordinary course of trade) must be considered in determining the "usual wholesale quantities" element of the statutory formula. It is further contended that since the sales in less than carload quantities and of less than 5,000 square feet during the selected period were within that

| [2] Quantity | No. of sales | % of total vol. of sales in square feet | % of total invoice value |
|---|---|---|---|
| Carload | 59 | 90. 59 | 89. 15 |
| Less than carload but over 5M sq. ft | 39 | 4. 57 | 5. 00 |
| Less than carload and less than 5M sq. ft | 170 | 4. 84 | 5. 85 |
| Total | 268 | 100. 00 | 100. 00 |

description, they must be considered, with the result that they constitute the major portion of sales which is, it is claimed under certain cited authorities which will be discussed hereinafter, the determinant of the usual wholesale quantities contemplated by the statute.

Although on the one hand the plaintiff has characterized the sales made in less than carload quantities as "accommodation" sales not sought by the manufacturer and exporter, nevertheless, it is not denied that at the time of exportation of the merchandise here involved the manufacturer and exporter freely offered such merchandise for sale for home consumption to all purchasers in Canada in the ordinary course of trade in less than carload quantities and in quantities of less than 5,000 square feet at prices represented by the appraised values. Collective exhibit 3, being a report of a customs agent referring, among other things, to an investigation at the offices of the manufacturer and exporter, shows that the latter issued price lists setting forth the three price levels, hereinbefore referred to, which price lists were circulated to the customers of the company. There is, therefore, no question but that the less than carload sales were not unusual and were made in the ordinary course of trade of the manufacturer and exporter. There is certainly nothing to show that there was any restriction upon such sales or offers, nor any refusal on the part of the manufacturer and exporter to make them.

The method of doing business adopted by the manufacturer and exporter herein at the time of exportation of the instant merchandise, i. e., setting up a basic price structure per unit with respect to purchases in carload quantities and charging higher prices per unit for purchases in lesser quantities, is a very familiar and common trade practice. Whether it be considered that the carload is the basic quantity and a premium is charged on lesser quantities, or the minimum quantity is the basic quantity and a discount is given for greater quantities, the end point is the same—the net effect is that of a quantity discount.

Starting with the premise, as appears in the instant case, that the various quantities which determine the price are wholesale quantities, the problem is to determine "the usual wholesale quantities" contemplated by the statute. Obviously, in a situation such as that at bar, where each of the three quantities which determined the price per unit was a "usual" wholesale quantity in the sense that they occurred commonly and customarily, it might be said that there were three "usual wholesale quantities" and hence three foreign values for the same merchandise, depending upon the quantity involved.

The precise question arose in the case of *United States* v. *M. Minkus*, 21 C. C. P. A. (Customs) 382, T. D. 46912. There, the merchandise involved consisted of miniature dictionaries, and there were eight different prices at which the dictionaries were freely offered for sale in

the foreign market, depending upon the quantity purchased. In deciding that case, the Court of Customs and Patent Appeals recognized that the word "quantities," as used in the statute (section 402 (b) of the Tariff Act of 1922, which, so far as here relevant, was identical with the present statute), was in the plural and iterated that it must be applied in the plural. From the context and the conclusion, however, it appears that the court considered the word "quantities" to refer to any given range of quantities which controlled one price. An example of this might be made on the facts of the present situation if it be considered that an order for 3,000 square feet of plywood would be supplied at the same price per unit as an order for 4,000 square feet. Thus, both 3,000 square feet and 4,000 square feet would be "usual wholesale quantities" but there would be only one price per unit to which both were tied.

The court further held that—

* * * the statute does not contemplate two or more "usual wholesale quantities" having two or more market values or prices. On the contrary, the statute does contemplate, we think, but one—*the usual*—having but one "market value" or "price * * * at which such or similar merchandise is freely offered for sale to all purchasers," at the time of exportation to the United States. [Italics quoted.]

This holding required that where a situation existed, as in the case at bar, in which merchandise was offered at varying prices per unit according to the quantity purchased, one of those prices must be selected as referring to "the usual wholesale quantities" contemplated by the statute. The determinant of "the usual wholesale quantities" in such a case was held to be those wholesale quantities (controlled by one price) in which a major portion of the sales or offers for sale was made.

It is clear from the majority opinion in the *Minkus* case that the parent case used as the basis for the holding that there could not be for appraisement purposes more than one market value or price for a given commodity on a given date is the decision of the Supreme Court of the United States in *United States* v. *Passavant*, 169 U. S. 16. The decision of the Supreme Court in that case will be discussed, *infra*, but it is sufficient to note at this point that the majority opinion in that case contains the following language:

What was to be ascertained was the actual market value or wholesale price of the merchandise as bought and sold in usual wholesale quantities at the time of exportation, in the principal markets of the country from whence imported. This market value or price was the price in Germany and not the price after leaving that country, and the act does not contemplate two prices or two market values.

While the coupling of the statutory expression "the usual wholesale quantities" with the judicial interpretation thereof as referable to "a major portion of sales or offers for sale" had been made in earlier

cases, it would appear that the *Minkus* case was the first full expression by the Court of Customs and Patent Appeals of the "major portion of sales or offers for sale" doctrine. It had been mentioned in the case of *G. W. Pleissner* v. *United States*, 16 Ct. Cust. Appls. 507, T. D. 43237, among others, but there had been expressly left open the question of whether there might not be more than one wholesale quantity to establish foreign value. The *Minkus* case answered that question in the negative.

In his opinion specially concurring in the conclusion in the *Minkus* case, Judge Bland, then of our appellate court bench, expressed his view that the adoption of a hard-and-fast rule that "the usual wholesale quantities" means "a major portion of sales or offers for sale" was unfortunate, and suggested that the matter should have been left open "so that in instances where the application of such a rule produced an unconscionable anomaly, an exception to it could be made without destroying it." He pointed to numerous instances, such as where the sales or offers for sale in various wholesale quantities were exactly in balance numerically, or where the volume of business in certain wholesale quantities was highly disproportionate to the numbers of sales in such quantities (a situation which occurs in the case at bar), in which the rule would either be unworkable or unconscionable.

Since the decision in the *Minkus* case, the use by the courts of "a major portion of sales or offers for sale" as the determinant of "the usual wholesale quantities" called for by the statute has been consistent. Among the cases decided by the Court of Customs and Patent Appeals in which the rule has been applied and/or discussed are *Adolph Goldmark & Sons Corp.* v. *United States*, 22 C. C. P. A. (Customs) 358, T. D. 47378; *United States* v. *G. Gennert, Inc.*, 22 C. C. P. A. (Customs) 374, T. D. 47388; *United States* v. *Livingston & Southard, Inc.*, 23 C. C. P. A. (Customs) 214, T. D. 48060; *United States* v. *Rodier, Inc.*, 23 C. C. P. A. (Customs) 336, T. D. 48196; *United States* v. *American Glanzstoff Corp.*, 24 C. C. P. A. (Customs) 35, T. D. 48308; *Lovell Dressel Co., Inc.* v. *United States*, 25 C. C. P. A. (Customs) 64, T. D. 49064; *Jenkins Brothers* v. *United States*, 25 C. C. P. A. (Customs) 90, T. D. 49093; *United States* v. *Semon Bache & Co.*, 25 C. C. P. A. (Customs) 387, T. D. 49466; *United States* v. *Mexican Products Co.*, 28 C. C. P. A. 80, C. A. D. 129; *Semon Bache & Co.* v. *United States*, 28 C. C. P. A. 166, C. A. D. 140; *American Shipping Co.* (*General Electric X-Ray Corp.*) v. *United States*, 29 C. C. P. A. 250, C. A. D. 198; and *M. V. Jenkins et al.* v. *United States*, 34 C. C. P. A. 33, C. A. D. 341.

It would appear that during the course of the treatment of the rule over the years the possibilities foreseen by Judge Bland in his concurring opinion in the *Minkus* case have become realities, in that

the rule, to judge by its treatment in the decided cases, has become inflexible and tied strictly to numerical superiority. Thus, in the recent case of *M. V. Jenkins et al.* v. *United States*, 34 C. C. P. A. 33, C. A. D. 341, at page 39, the rule is stated in this fashion:

It is well established that the usual wholesale quantity is determined by the greatest number of sales in wholesale quantities. See *United States* v. *M. Minkus*, 21 C. C. P. A. (Customs) 382, T. D. 46912, and cases therein cited.

This construction of the term "the usual wholesale quantities" used in the valuation sections of the tariff act by invoking the so-called "major portion of sales" rule is wholly in conflict with commercial realities, trade and business practices, and the facts and conditions of business and commerce in both foreign and domestic markets.

It is beyond question, in respect to both foreign and domestic trade and commerce, that for most transactions the basic unit price of goods is related, directly or indirectly, to the quantity purchased. Cf. R. Elberton Smith, *Customs Valuation in the United States* (Chicago, 1948), p. 169, and concurring opinion by Bland, J., in *United States* v. *M. Minkus*, 21 C. C. P. A. 382, at p. 390. The major portion of sales rule gives controlling importance to the greatest number of sales, which may be and often is wholly disproportionate to the volume and type of business done in a given commodity or item of goods, and which, experience has shown, does not necessarily present a true picture of the value situation in the actual market for the goods.

The facts in the case at bar, which are not uncommon, are very much in point. Here, the manufacturer normally distributed its product through a distributor organization, which gave a wide outlet and permitted lower distribution costs. However, for business reasons, it was expedient for the manufacturer to offer its product to purchasers of lesser quantities than would be taken by distributors, such as dealers, consumers, small jobbers, and even retailers. In order to protect its normal outlet through the distributors the manufacturer would have to sell to the purchasers of lesser quantities at the distributors' price, or it would be in competition with its own distributors.

The result is that, at the manufacturer's level the major portion of sales, although representing a very minor portion of the business, was made to the purchasers of lesser quantities than carload quantities. The record shows that when the customs valuation situation which gave rise to this and other cases developed because of the less than carload sales, the manufacturer discontinued selling in less than carload quantities. While it is not the situation before me, a consideration of the value situation which would be thereby presented is very revealing, and would doubtless be as follows: Assuming, as in the present case, that both less than carload quantities and carload quantities were wholesale quantities, the major portion of sales would still preponderate in favor of less than carload quantities as they would

be represented by the distributors' sales, which, in the nature of things, are greater in number than the manufacturer's. Obviously, as goods sift down through the ordinary channels of commerce at the wholesale level from producer to distributor to dealer, the greatest number of transactions, i. e., sales, will occur at the lowest rung of the ladder, for there the widest distribution is obtained by the breakdown of quantity purchases at the next higher level.

It therefore follows that inevitably the major portion of sales rule must lead to the adoption as "the usual wholesale quantities" of those quantities which are smallest, albeit wholesale, and which command the highest price. At best, the major portion of sales rule determines "the usual wholesale quantities," and consequently value, in a wholly adventitious manner. There is thereby often selected as the value of the goods for appraisement purposes an artificial, unreal, and distorted price, which does not necessarily accurately reflect the true value of the goods the subject of appraisement in the actual market thereof. This, in turn, imposes a hardship upon the importer and an unnecessary tax burden which is reflected in higher prices for the consumer of the goods.

The major portion of sales rule was evidently derived from a misconception of what a majority of the Supreme Court of the United States said about prices and market values in the case of *United States* v. *Passavant*, 169 U. S. 16, wherein the Supreme Court said:

\* \* \* and the act does not contemplate two prices or two market values.

From this latter statement by the high Court it was apparently concluded below that there could not be several usual wholesale quantities having several different market values or prices in the foreign market, and that, therefore, the statute contemplated only one single usual wholesale quantity (or range of quantities) having one single market value or price. To select this single usual wholesale quantity or range of quantities in cases where the price varied by reason of quantity purchased, the major portion of sales rule was devised and interpolated into the statute as the determinant of "the usual wholesale quantities" mentioned in the statute.

This is an extension of the holding of the Supreme Court which is not warranted either by the language or facts of the *Passavant* case or by the language of the valuation statutes as then in existence or subsequently enacted. The Supreme Court did *not* say that the act contemplated only one usual wholesale quantity or range of quantities. The matter of usual wholesale quantities was not involved in the case at all. The Supreme Court *did* say that the act does not contemplate two prices or two market values, meaning that the United States appraiser of merchandise should not return two prices or two market values in his official appraisement, but only one price or market value for the goods under appraisement.

That there may in fact exist on the same day two market values or prices for any given item of goods cannot be questioned. Thus, we often find one price in the foreign market for goods when sold for home consumption and a different price in the same market for the identical goods when sold for export to the United States. In that case, the statute (section 402 (a) (1)) recognizes the existence of two market values or prices and requires that the higher of the two be taken as the value of the merchandise for appraisement purposes. That there may be, and often are, two or more market values or prices for identical goods, depending upon the quantity purchased, likewise should not be questioned—it is a fact of everyday business life. The selection of the value to be adopted as the statutory value in such cases (all other elements of the statute being satisfied) should proceed upon the realistic basis of the category as to quantity in which the imported merchandise falls.

In the appraisement of merchandise for tariff purposes various aspects of the goods, tangible and intangible, are elements for consideration in arriving at the value thereof. There is no reason why, in cases where the value or price of such or similar goods in the foreign market depends upon the quantity purchased, the quantity imported should be disregarded in determining the value thereof.

Certainly, to adopt this view in the valuation of imported merchandise where the value in the foreign market varies with the quantity purchased has at least two important advantages over the use of the major portion of sales rule—it brings the value of the goods for customs purposes in line with commercial reality and actual truth, and makes for administrative simplicity. Obviously, in order to use the major portion of sales rule, the sales experience of not only the exporter should be inquired into, but also that of the entire trade in the foreign market dealing in such commodity. How this could be done with any degree of accuracy and speed, and in large numbers of cases, presents what seems to be an insuperable investigative and administrative problem. Furthermore, what has been said heretofore has related to sales experience. The statute speaks of offers of the goods for sale. Just how the major portion of offers for sale could be determined, especially in cases where price lists and catalogs were used rather than individual offers, has not been suggested by anyone.

The plain fact that appears from the record in the case at bar is that all who cared to buy in carload quantities could do so at the carload quantity price—there was no other restriction whatsoever. A finding of foreign value at that price is entirely in accord with the letter and spirit of the statute—it does not result in the return of two or more values for the merchandise. What is being appraised is the merchandise before the court, and its value is based upon a comparison with "such" merchandise in the foreign market. That

another shipment of identical plywood made on the same day but in less than carload quantity should be appraised at a higher unit price has no bearing upon the situation as to the carload quantity merchandise. There is an element—the quantity—which affects the value of the merchandise just as many other tangible and intangible elements may affect the value.

To apply the so-called major portion of sales rule to the facts of this case and hold that the market value or price of merchandise imported in carload quantities was that applicable to sales in quantities of less than a carload and less than 5,000 square feet would artificially raise the market value of the goods for customs revenue purposes above the value of the goods in the actual market for such goods and above the price at which anyone who cared to buy could purchase such goods, and would impose upon the importer a hardship and an unreasonable and unjust tax burden and a higher price upon the American consumer. Such a construction of the statute would deprive the plaintiff herein of its money and property without due process of law in violation of the fifth amendment to the Constitution.

Upon the entire record I find as facts:

1. That the merchandise involved consists of birch plywood of certain thicknesses and qualities imported into the United States from Canada and entered on August 25, 1947.

2. That the merchandise was imported in carload quantities.

3. That at the time of exportation of the instant merchandise the usual wholesale quantities in which such merchandise was freely offered for sale for home consumption in the ordinary course of trade to all purchasers in the principal markets of Canada were (a) in carload quantities, (b) in less than carload quantities but over 5,000 square feet, and (c) in less than carload quantities and less than 5,000 square feet.

4. That the price of such merchandise under the conditions expressed in finding 3, above, varied, depending upon the quantity purchased.

5. That the entered value for each item represents the carload quantity price.

6. That there was no higher price at which the merchandise was offered for sale for exportation to the United States.

I therefore conclude as matters of law:

1. That foreign value, as that value is defined in section 402 (c) of the Tariff Act of 1930, as amended by section 8 of the Customs Administrative Act of 1938, is the proper basis of value for the merchandise in question.

2. That such value for each item involved is the entered value.

Judgment will issue accordingly.